WARNICKE & LITTLER, P.L.C.
1411 N. Third Street
Phoenix, Arizona 85004
TELEPHONE (602) 256-0400
FAX (602) 256-0345
E-MAIL: administrator@warnickelittler.com
Ronald E. Warnicke/SBN 001791
Thomas E. Littler/SBN 006917
Attorneys for Debtor

FILED

2002 FEB -4 P 3: 00

KEVIN E. O'BRIEN
CLERK
U.S. BANKRUPTCY
DISTRICT OF ARIZONA

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>MW MEDICAL, INC., a Nevada corporation,<br><br>Debtor. | No. 02-01090-PHX-RTB<br><br>Chapter 11 |
| In re:<br><br>MICROWAVE MEDICAL CORPORATION,<br>a California corporation,<br><br>Debtor. | No. 02-01298-PHX-GBN<br><br>Chapter 11 |

**JOINT DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF**

**REORGANIZATION DATED FEBRUARY 4, 2002**

**PROPOSED BY WARNICKE & LITTLER FOR THE DEBTOR**

# DEBTORS' DISCLOSURE STATEMENT

**ARTICLE**                                                                                    **PAGE**

I     DEADLINE FOR RECEIPT OF BALLOTS ................................................5

II    DEADLINE FOR FILING PROOFS OF CLAIMS ARISING FROM
      REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS ........5

III   DATE AND TIME OF HEARING ON CONFIRMATION OF THE JOINT PLAN ...6

IV    INTRODUCTION TO THE DISCLOSURE STATEMENT ................................6

V     DISCLAIMERS AND WARNINGS................................................................7

VI    VOTING.................................................................................................10
      A    ENTITIES ENTITLED TO VOTE AND ADMONITION TO
           VOTE IF ELIGIBLE ......................................................................10
      B    VOTING INSTRUCTIONS ................................................................12
      C    THE RESULTS OF BALLOTING ON THE PLAN ARE
           DETERMINED BY CLASS ..............................................................12
      D    CONFIRMATION BASED UPON ACCEPTANCE OF THE
           PLAN BY ALL IMPAIRED CLASSES ..............................................13
      E    CONFIRMATION OVER THE OBJECTIONS OF ONE OR
           MORE IMPAIRED CLASSES ..........................................................13
      F    CONSEQUENCES IF THE PLAN IS NOT CONFIRMED ......................14

VII   DESCRIPTION OF THE DEBTOR AND ITS OPERATIONS.......................14
      A    HISTORY AND BACKGROUND ......................................................14
           1.   Description of Business.........................................................14
           2.   Principal Services and Products.............................................14
           3.   Multi-Platform Device .........................................................15
           4.   Recent Approvals.................................................................16
           5.   Telangiectasia (Spider Veins) Treatments...............................17
           6.   Orbital Facial Wrinkles........................................................17
           7.   Striae (Stretch Marks) Treatments .........................................18
           8.   Additional Clinical Uses.......................................................18
           9.   Competition and Marketing....................................................18
           10.  Marketing Strategy...............................................................19
           11.  Employees...........................................................................20
           12.  Patents and Trademarks ........................................................20
           13.  Research and Development Expenditures...................................20
           14.  Corporate Organization and History.......................................21
      B    MANAGEMENT..............................................................................22
      C    ASSETS OWNED ...........................................................................23
      D    EVENTS LEADING TO FILING OF CHAPTER 11 PETITION.................23
      E    POST-PETITION DEVELOPMENTS AND OPERATIONS ......................24
           1.   Post-petition Management of the Debtor..................................24
           2.   Plans of Reorganization ........................................................24

VIII  SUMMARY OF THE PLAN...................................................................24
      A    OBJECTIVE OF THE REORGANIZATION ........................................24
      B    COMPENSATION OF DIRECTORS AND OFFICERS ..........................25

2

    C      POST-CONFIRMATION BUSINESS OPERATIONS ........................25
    D     ACCEPTANCE AND REJECTION OF EXECUTORY CONTRACTS .........26
    E     CLASSIFICATION OF AND TREATMENT OF CLASSIFIED
          CLAIMS AND INTERESTS.................................................................26
          1.  General ...............................................................................26
          2.  Class 1: Administrative Expenses .......................................26
          3.  Class 2: Priority Tax Claims ...............................................27
          4.  Class 3: Priority Wage Claims ............................................27
          5.  Class 4: General Unsecured Claims .....................................27
          6.  Class 5: Unsecured Portion of Secured Creditors' Claims.............27
          7.  Class 6: Secured Claims ......................................................27
          8.  Class 7: Equity Security Holders' Interests.........................28
          9.  Elimination of Classes ........................................................28
    F      IDENTIFICATION OF UNIMPAIRED CLASSES OF CLAIMS AND
          EQUITY INTERESTS......................................................................28
          1.  Impaired Classes of Claims .................................................28
          2.  Impairment Controversies ...................................................29
    G     ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION
          BY ONE OR MORE CLASSES OF CLAIMS.....................................29
          1.  Classes Entitled to Vote......................................................29
          2.  Creditors Not Entitled To Vote ...........................................29
          3.  Class Acceptance Requirement ............................................29
          4.  One Vote Per Holder ..........................................................29
          5.  Cramdown ..........................................................................29

IX     TREATMENT OF ADMINISTRATIVE EXPENSES AND CLASSES NOT
        IMPAIRED UNDER THE PLAN........................................................29
        1.  Class 1: Administrative Expenses .......................................29
        2.  Class 2: Priority Tax Claims ...............................................30

X      TREATMENT OF CLASSES IMPAIRED UNDER THE PLAN ...............30
        1.  Class 3: Priority Wage Claims ............................................30
        2.  Class 4: General Unsecured Claims .....................................30
        3.  Class 5: Unsecured Portion of Secured Creditor's Claim ...............31
        4.  Class 6: Secured Claims ......................................................31
        5.  Class 7: Equity Security Holders' Interests.........................31

XI    GENERAL PROVISIONS CONCERNING THE CONSEQUENCES OF
        CONFIRMATION...........................................................................31
        1.  Ownership of the Debtor's Assets ......................................31
        2.  Retained Right to Enforce Causes of Action........................32
        3.  Insurance ............................................................................32
        4  Satisfaction of Claims.........................................................32
        5  Unclaimed Distributions .....................................................32
        6  Binding Nature of the Plan .................................................33
        7  Termination of the Automatic Stay and Discharge ..............33

XII   A.  RISK FACTORS ASSOCIATED WITH CONFIRMATION OF THE PLAN .....33
      B.  TAX CONSEQUENCES ....................................................................34

XIII  IMPLEMENTATION OF THE PLAN .................................................34

XIV  ALTERNATIVES TO THE PLAN: LIQUIDATION ANALYSYS.....................34

XV  MODIFICATION OF THE PLAN .....................................................35

3

XVI     RETENTION OF BANKRUPTCY COURT JURISDICTION ................................ 35

XVII    RECOMMENDATION OF PROPONENTS ......................................................... 36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ARTICLE I.

## DEADLINE FOR RECEIPT OF BALLOTS.

INSTRUCTIONS AND EXPLANATIONS CONCERNING VOTING ON THE JOINT PLAN ARE SET FORTH IN SUBSEQUENT SECTIONS OF THIS DISCLOSURE STATEMENT. PLEASE REVIEW THOSE SECTIONS CAREFULLY AND NOTE THAT ALL BALLOTS MUST BE RECEIVED BY THE ___ DAY OF _____, 2002, OR THEY MAY NOT BE COUNTED. AS DELAYS IN THE DELIVERY OF MAIL CAN OCCUR, THE PLAN PROPONENTS URGE YOU TO MAIL OR DELIVER YOUR BALLOTS AS DIRECTED WELL IN ADVANCE OF THE DEADLINE.

VOTING ON THE JOINT PLAN WILL AFFECT YOUR RIGHTS AND THE EXPENSES INCURRED TO ADMINISTER THIS CASE. IN PARTICULAR, THE DEBTOR MAY BE ABLE TO REDUCE THE ADDITIONAL ATTORNEYS' FEES AND COSTS IT MIGHT HAVE TO INCUR TO OBTAIN CONFIRMATION OF ITS PLAN IF THE PLAN IS ACCEPTED BY ALL CLASSES OF CLAIMS AND INTERESTS CREATED BY THE PLAN. THE DEBTOR REQUESTS, THEREFORE, THAT YOU VOTE IF YOU ARE ENTITLED TO DO SO AND THAT YOU TAKE **STEPS TO INSURE THAT YOUR BALLOT IS RECEIVED IN TIME TO BE COUNTED**.

# ARTICLE II.

## DEADLINE FOR FILING PROOFS OF CLAIMS ARISING FROM REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS

The Plan provides for the rejection, as permitted by section 365 of the Bankruptcy Code, of certain unexpired leases and contracts, which the Debtor has identified as "executory contracts". Those leases and contracts are identified in this Disclosure Statement, which also sets a deadline for filing proofs of all claims which might arise as the result of the rejection.

If you have a contract with the Debtor, review the identified provision of this Disclosure

Statement and **timely file your a proof of any claim to which you may be entitled with the Clerk of the Bankruptcy Court at the following address or your claim will likely be forever barred**:

Clerk, U.S. Bankruptcy Court
2929 North Central Avenue, 9th Floor
Phoenix, AZ 85012

## ARTICLE III.

## DATE AND TIME OF HEARING ON CONFIRMATION OF THE JOINT PLAN.

A copy of the Plan is attached as **Exhibit "1"** to this Disclosure Statement. A hearing on confirmation of the Plan will be held before the Honorable Redfield T. Baum, United States Bankruptcy Judge, commencing at _____ o'clock _____.m. on _____ in Court Room No.2, at the United States Bankruptcy Court, United States Courthouse, Eleventh Floor, 2929 North Central Avenue, Phoenix, Arizona. The hearing may be continued from time to time without further written notice.

## ARTICLE IV.

## INTRODUCTION TO THE DISCLOSURE STATEMENT.

Unless otherwise defined in the Definition attached to the Joint Plan, the terms used in this Disclosure Statement have the same meanings as those terms have in the Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Code"), or as those terms have in the Federal Rules of Bankruptcy Procedure, promulgated pursuant to 28 U.S.C. § 2075 or in the Plan.

This Disclosure Statement is being submitted by Warnicke & Littler for the Debtor. The Proponents have promulgated this Disclosure Statement in accordance with section 1125 of the Code for the purpose of soliciting acceptances of the Plan from holders of impaired claims and equity interests. This Disclosure Statement has been compiled to incorporate "adequate information" to enable creditors and stockholders ("Equity Interest Holders") to make an informed judgment as to whether they should vote to accept or reject the Plan.

The Bankruptcy Court approved this Disclosure Statement on _____ as

6

containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor typical of each of the classes of claims and interests being solicited to make an informed judgment whether to vote to accept or reject the Plan.

## ARTICLE V.

## DISCLAIMERS AND WARNINGS

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A CERTIFICATION THAT THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS ACCURATE NOR AN ENDORSEMENT OF THE JOINT PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PROMULGATED BY THE PROPONENTS IN AN EFFORT TO SOLICIT CREDITORS AND EQUITY INTEREST HOLDERS TO VOTE TO ACCEPT THE PLAN. THE SOLICITATION IS A SOLICITATION BY THE **PROPONENTS ONLY. IT IS NOT** A SOLICITATION BY THE ATTORNEYS OR ACCOUNTANTS, AND THE REPRESENTATIONS MADE HEREIN ARE THOSE OF THE PROPONENTS AND NOT OF THE DEBTOR'S ATTORNEYS OR ACCOUNTANTS.

THIS DISCLOSURE STATEMENT IS NOT THE PLAN (SEE SUMMARY OF THE PLAN HEREIN). THIS DISCLOSURE STATEMENT AND THE COMPLETE COPY OF THE PLAN, WHICH IS ATTACHED, SHOULD BOTH BE READ IN THEIR ENTIRETY. FOR THE CONVENIENCE OF CREDITORS AND EQUITY INTEREST HOLDERS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT **THE PLAN ITSELF** AND NOT THE PLAN SUMMARY **IS CONTROLLING** IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE TWO.

CERTAIN MATERIALS CONTAINED IN THIS DISCLOSURE STATEMENT ARE TAKEN DIRECTLY FROM OTHER, READILY ACCESSIBLE DOCUMENTS OR ARE DIGESTS OF DOCUMENTS. WHILE EFFORTS HAVE BEEN MADE TO CONVEY ACCURATELY THE

CONTENTS OF SUCH DOCUMENTS, YOU ARE URGED TO EXAMINE THE DOCUMENTS THEMSELVES AND TO USE THE DESCRIPTIONS OF DOCUMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ONLY AFTER HAVING CONDUCTED SUCH AN EXAMINATION.

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTOR, INCLUDING, WITHOUT LIMITATION, ITS FUTURE BUSINESS OPERATIONS, THE VALUE OF ITS PROPERTY, OR THE VALUE OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. IN ARRIVING AT YOUR DECISION TO ACCEPT OR REJECT THE PLAN, YOU SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN, WHICH ARE OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT. SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE PROPONENTS WHO, IN TURN, SHALL DELIVER SUCH INFORMATION TO THE COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

EFFORTS HAVE BEEN MADE TO PREPARE ALL FINANCIAL STATEMENTS, WHICH MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPALS. HOWEVER, AS TO ALL FINANCIAL STATEMENTS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE ACCURACY OF THE INFORMATION CONTAINED IN THOSE STATEMENTS TO BE WITHOUT ERROR.

THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECTED TO AN EXAMINATION BY INDEPENDENT, CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTOR HAS KEPT RECORDS SUBSEQUENT TO THE FILING OF THE PETITION COMMENCING THIS CASE AND THE DEBTOR HAS FILED MONTHLY FINANCIAL REPORTS WITH THE COURT SINCE THAT DATE.

THE LIQUIDATION ANALYSIS CONTAINED IN THIS DISCLOSURE STATEMENT WAS NEITHER COMPILED BY INDEPENDENT, CERTIFIED PUBLIC ACCOUNTANTS NOR SUBJECTED TO AN AUDIT OR EXAMINATION BY INDEPENDENT, CERTIFIED PUBLIC ACCOUNTANTS.

THE SECURITIES OF THE REORGANIZED DEBTOR AND THE OPERATING SUBSIDIARIES TO BE ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR WITH ANY GOVERNMENTAL AGENCY UNDER THE LAWS OF ANY STATE. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE'S GOVERNMENTAL AGENCY HAS APPROVED OR DISAPPROVED SUCH SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

**IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU SHOULD DO SO**. UNDER THE BANKRUPTCY CODE, DETERMINING THE OUTCOME OF BALLOTING ON THE PLAN REQUIRES A CALCULATION, WHICH CONSIDERS THE VOTES OF THOSE CREDITORS AND EQUITY INTEREST HOLDERS WHO ACTUALLY VOTED ON THE PLAN. YOUR RIGHTS MAY BE AFFECTED EVEN IF YOU DO NOT VOTE ON THE PLAN. YOUR OPPORTUNITY TO HAVE THE OUTCOME YOU DESIRE WILL LIKELY BE ENHANCED IF YOU VOTE.

NOTHING IN THIS DISCLOSURE STATEMENT OR THE PLAN LIMITS DEBTOR'S RIGHTS TO OBJECT TO ANY PROOFS OF CLAIMS OR INTERESTS FILED IN THIS CASE.

THE PLAN CONTEMPLATES THE ISSUANCE OF SECURITIES TO CREDITORS IN COMPLETE OR PARTIAL SATISFACTION OF THEIR CLAIMS PURSUANT TO § 1145 OF THE BANKRUPTCY CODE, "EXEMPTION FROM SECURITIES LAWS". WHILE § 1145 AND THE PROVISIONS OF THE PLAN PURPORT TO MAKE THE ISSUANCE OF SUCH SHARES

UNDER § 1145 FREE TRADING. THE PROPONENTS AND THEIR REPRESENTATIVES MAKE NO REPRESENTATIONS AS TO WHETHER ANY SECURITIES ISSUED PURSUANT TO THE PLAN, ONCE PLACED IN THE HANDS OF RECIPIENTS UNDER THE PLAN, MAY BE FREELY TRADED.

IT IS ADVISABLE FOR EACH RECIPIENT OF SECURITIES ISSUED PURSUANT TO THE PLAN TO CONSULT INDEPENDENT COUNSEL PRIOR TO SELLING THOSE SECURITIES. ALL CREDITORS AND EQUITY INTEREST HOLDERS ARE ALSO URGED TO CONSULT COUNSEL REGARDING TAX CONSEQUENCES OF THE PLAN AND, IN PARTICULAR, ANY TAX CONSEQUENCES OF RECEIVING SECURITIES UNDER THE PLAN.

BECAUSE THE PROPONENTS DO NOT EXPRESS ANY OPINION AS TO THE TAX CONSEQUENCES OF THE PLAN, IN NO EVENT WILL THE DEBTOR, THE CO-PROPONENTS, THEIR PRINCIPALS OR THE PROFESSIONAL ADVISORS THEY HAVE ENGAGED, BE LIABLE IF, FOR ANY REASON, THE TAX CONSEQUENCES OF THE PLAN ARE NOT AS ANTICIPATED BY CREDITORS AND EQUITY INTEREST HOLDERS. CREDITORS AND EQUITY INTEREST HOLDERS MUST LOOK SOLELY TO AND RELY SOLELY UPON THEIR OWN ADVISORS AS TO THE TAX CONSEQUENCES OF THE PLAN.

**ARTICLE VI.**

**<u>VOTING</u>**

A. **<u>ENTITIES ENTITLED TO VOTE AND ADMONITION TO VOTE IF ELIGIBLE</u>**

Only creditors and equity interest holders whose claims and interests have been both **<u>allowed</u>** for purposes of voting **<u>and "impaired"</u>** by the Plan are entitled to vote on the Plan.

For a claim to be allowed for voting purposes, the claim must be listed in the Debtor's Chapter 11 schedules **<u>and</u>** must **<u>not</u>** be listed as "disputed", "contingent" or "unliquidated". If a claim is listed but shown as "disputed", "contingent" or "unliquidated", the holder of the claim will not be entitled to

10

vote absent the timely filing of a proof of claim.

If a claim is not listed or is listed as "disputed", "contingent", or "unliquidated", the holder of the claim must file a proof of claim on or before the bar date set by the Court (or the Debtor must file a proof of claim for that creditor as permitted by the Federal Rules of Bankruptcy Procedure) for that creditor to be entitled to vote. Moreover, no holder of a claim will be entitled to vote if any party in interest objects to that claim before balloting on the Plan or any Amended Plan occurs, unless the Bankruptcy Court enters a specific order allowing the claim for voting purposes.

For an equity interest to be allowed, the equity interest holder's asserted interest must appear in the Debtor's schedules or the holder of the equity interest must file a proof of interest before the bar date set by the Court (or the Debtor must do so for the interest holder as permitted by the Federal Rules of Bankruptcy Procedure), and the equity interest holder must be a record holder of the Debtor's securities on the date of the order approving this Disclosure Statement is entered on the Court's docket. In addition, no entity claiming to hold an equity interest may vote if any party in interest has objected to the allowance of the asserted interest prior to voting on the Plan or any Amended Plan, unless the Bankruptcy Court enters an order allowing the interest for voting purposes.

In addition to the foregoing criteria for voting eligibility, only creditors and equity interest holders whose claims or interests are "impaired" by the Plan (i.e., those whose claims or interests are altered or who will not receive the allowed amount of their claims in cash pursuant to the original terms of their agreements) are entitled to vote to accept or reject the Plan. Holders of claims or interests, which are not "impaired", are deemed to have accepted the Plan as a matter of law.

If the claim or interest you hold has been classified in one of the impaired classes of claims or interests created by the Plan (see **Exhibit "1"**), it is important that you vote. In addition, if you hold more than one claim or interest classified as "impaired" under the Plan, it is important that you vote with respect to **each** such claim or interest. **IF YOU FAIL TO VOTE, YOUR RIGHTS MAY BE JEOPARDIZED**.

**B.**     **VOTING INSTRUCTIONS**

After carefully reviewing this Disclosure Statement and its exhibits, vote to accept or reject the Plan on the enclosed ballot (or ballots) and mail or deliver it (or them) to the addresses identified below so that your ballot (or ballots) are **received by the bar date specified**.

All ballots must be signed and received prior to _____.  Mail or deliver original ballots to:

> Clerk
> U.S. Bankruptcy Court
> District of Arizona
> 2929 N. Central Avenue
> Phoenix, Arizona  85004

Also, mail or deliver copies of all ballots to the Debenture Holders' attorneys at the following address:

> Ronald E. Warnicke, Esq.
> Warnicke & Littler, P.L.C.
> 1411 North Third Street
> Phoenix, Arizona 85004

AS MAIL DELAYS MAY OCCUR, IT IS IMPORTANT THAT THE BALLOT OR BALLOTS BE MAILED OR DELIVERED **WELL IN ADVANCE** OF THE BAR DATE SPECIFIED.  BALLOTS RECEIVED AFTER THIS DATE MAY NOT BE COUNTED.

Each creditor entitled to vote is to receive a ballot for each separately classified, impaired claim held.  Each equity interest holder entitled to vote is also to receive a ballot.

If you do not receive the required number of ballots, with your copy of the Court-approved disclosure statement, notify the proponent's attorneys immediately at the address noted above.  **IT IS IMPORTANT FOR YOU TO CAST ALL BALLOTS WHICH YOU ARE ENTITLED TO VOTE.**

**C.**     **THE RESULTS OF BALLOTING ON THE PLAN ARE DETERMINED BY CLASS.**

In general, a class of claims accepts the Plan if the creditors who vote to accept the Plan hold at

least two-thirds (2/3) in dollar amount and constitute more than one-half (1/2) in number of the allowed claims in the class **actually voting** on the Plan.  In general, a class of equity interests accepts the Plan if it is accepted by those who hold at least two-thirds (2/3) of the allowed interests in the class **actually voting** on the Plan.

**D.**    **CONFIRMATION BASED UPON ACCEPTANCE OF THE PLAN BY ALL IMPAIRED CLASSES.**

If each class of impaired claims and interests accept the Plan and the Plan is confirmed, the Plan will bind all holders of claims and interests, including those who did not vote and those who voted to reject the Plan.

**THE PROPONENTS RECOMMEND THAT ALL THOSE ENTITLED TO VOTE CAST THEIR BALLOTS TO ACCEPT THE PLAN.**

The Plan may also be confirmed if all impaired classes do not accept it, so long as the Plan is accepted by at least one class of impaired claims.  Confirmation over the objections of one or more classes of claims or interests is called "cramdown".

**E.**    **CONFIRMATION OVER THE OBJECTIONS OF ONE OR MORE IMPAIRED CLASS.**

If the Plan is rejected by one or more impaired classes of claims or interests, the Plan or modification thereof may still be confirmed by the Court at the request of the Proponents.  To grant such a request, the Court must find, among other things, that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting, impaired class of claims or interests.

The phrases "discriminate unfairly" and "fair and equitable" are defined by § 1129 of the Bankruptcy Code and the case law interpreting that statute.  In other words, those phrases are "terms of art" denoting specific statutory criteria for confirmation which the Joint Plan must satisfy to be confirmed by the Bankruptcy Court if any impaired class of claims or equity interests rejects the Plan.

The Plan does satisfy the statutory criteria required by § 1129 of the Code, and the Proponents intend to request confirmation of the Plan in the event it is rejected by any impaired class.

## F.  CONSEQUENCES IF THE PLAN IS NOT CONFIRMED.

The Debtor has no assets that are not secured by a perfected security interest. If the Plan is not confirmed the case will be dismissed or converted. If the case is dismissed or converted, the proponents believe that the creditors and shareholders will receive nothing.

## ARTICLE VII.

## DESCRIPTION OF THE DEBTOR AND ITS OPERATIONS.

## A.  HISTORY AND BACKGROUND.

### 1.  Description of Business

MW Medical, Inc. was in the business of manufacturing and selling its primary product, the MW 2000. It was also in the business of designing and developing microwave technologies for dermatological applications through its wholly owned subsidiary, Microwave Medical Corporation, a California corporation. Unless specified otherwise, throughout this Disclosure Statement, MW Medical, Inc. and this subsidiary will be referred to jointly as the Debtor.

### 2.  Principal Services and Products

The Debtor is engaged in the development of technologies relating to the use of microwave energy for medical applications. In January of 1999, the US Patent and Trademark Office issued a patent to the Debtor entitled, "Method and Apparatus for Treating Subcutaneous Histological Features," which focuses on the application of microwave energy in the treatment of spider veins and for use in hair removal. The use of microwave for hair removal is based upon the selective heating of hair follicles while cooling the surface of the skin for its protection. The hair follicle is the tissue around the hair, which promotes the growth of the hair. The Debtor used computer modeling and laboratory studies to optimize its system for hair removal.

The nature of the Debtor's microwave technology, high frequency RF energy delivered under highly controlled conditions, require the Debtor to research, design and develop unique components.

14

These propriety components were then incorporated into systems using other mechanisms from a variety of suppliers.

The Debtor's focus is in the precise delivery of microwave energy to targeted tissue in whichever application the microwave energy is operating. Its product development efforts require basic research, design engineering, clinical investigation and manufacturing engineering. The final product must not only work as designed technically, it must be clinically effective and commercially viable. Although, some of these efforts are within the Debtor's control and expertise, it operates in a regulated industry. As a result, governmental regulatory bodies will often determine product availability to the market.

On October 25, 1999, the FDA granted the Debtor approval to begin marketing its microwave hair removal device for the removal below the neck. The resulting product, the MW 2000, was then launched in selected locations. Sales for the MW 2000 were slow for a variety of reasons, including lack of approval for facial hair removal, the size of the aperture, and longer than expected trial periods for sales. The Debtor continued clinical trials for facial hair removal and applied for approval to begin marketing the large aperture. The longer trial periods required by many doctors have caused the Debtor's sales cycle to be longer than expected.

The Debtor planned to complete development of a microwave therapy system that incorporates the technology described in its patent application for the treatment of telangiectasia, or, spider veins as a follow up to its initial hair removal treatment. Spider veins are thread-like red to purplish veins that stem from a network of small veins just below the surface of the skin. Spider veins develop more predominantly on the legs and faces of women. At this time, injection and lasers are the predominant treatments for this condition. The Debtor conducted clinical trials for the treatment of telangiectasia but did not complete the clinical trials during 2001 as anticipated.

3.   **Multi-Platform Device**

15

One of the Debtor's strengths is the multi-platform nature of its device. The device is comprised of a versatile amplifier and interchangeable delivery devices. Using this platform, the Debtor believes it can produce a family of devices to meet customer expectations for economy, performance and efficiency and patient needs for safety and efficacy.

The core microwave system is capable of producing energy at frequencies and pulse durations, which should provide clinical utility in a variety of aesthetic and therapeutic procedures. Although specific system configurations are not yet determined, by modifying accessories, rather than the core microwave system for each indication, the Debtor may be able to provide cost-effective solutions for users while building economies of scale in future manufacturing processes.

### 4. __Recent Approvals__

In January, 2000, the US Patent Office issued a new patent for its microwave delivery system, entitled, "Method and Apparatus for Treating Subcutaneous Histological Features". This patent focuses on a system and method for treating subcutaneous histological features without affecting adjacent tissues adversely by employing microwave energy of selected power, frequency and duration to penetrate subcutaneous tissue and heat target areas with optimum dosages to permanently affect the undesirable features. The frequency chosen preferentially interacts with the target areas as opposed to adjacent tissue, and the microwave energy is delivered as a short pulse causing minimal discomfort and side effects.

On October 25, 1999, MMC's microwave system for non-facial hair removal received written approval from the U.S. Department of Health and Human Services, Food and Drug Administration (FDA) to begin marketing. The device has been classified into Class II (Special Controls). The Debtor may, therefore, market this device subject to the general control provisions of the Act, including requirements for annual registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and adulteration, and the additional controls mandated by the Class II

16

classification.

On February 23, 2001, the Debtor submitted its application to the FDA for approval to begin marketing the larger aperture headpiece for the MW2000. The Debtor hopes that this device will be classified as a Class II (Special Controls) device. If approval is obtained, the Debtor will market this device subject to the general control provisions of the Act, including requirements for annual registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and adulteration, and the additional controls mandated by the Class II classification.

### 5. <u>Telangiectasia (Spider Veins) Treatments</u>

In October 2000, the Debtor received Investigational Review Board approval from Independent Review Consulting, Inc. to conduct Phase III clinical trials for the treatment of spider veins (telangiectasias) in the legs using MW's microwave delivery system. The Debtor conducted clinical trials at four sites around the country in 2001. The Debtor anticipated that the clinical trials for the treatment of spider veins would be concluded sometime during 2001 and that the Debtor would proceed with an FDA submission for this application at that time. Sales did not meet expectations and funding did not become available.

### 6. <u>Orbital Facial Wrinkles</u>

The Debtor believes that its microwave technology may provide an effective treatment for facial elastosis, or facial wrinkles. Facial wrinkles exist widely in certain age groups with the financial means and motivation to correct the condition. The market opportunity is of significant interest to the Debtor because the providers of current solutions are part of its current target market and technology may offer benefits not currently available with other modalities.

In September 1999, the Debtor received IRB approval for a pilot study to treat orbital facial wrinkles as an alternative to laser therapy and chemical peels. This is high-demand elective procedure that, as currently performed, requires dedicated equipment and long patient recovery periods. The

Debtor believes its technology may perform non-ablative heating of the dermatologic structures to provide a clinical improvement in the appearance of facial wrinkles. However, there can be no assurance that such results will materialize upon testing.

### 7.    Striae (Stretch Marks) Treatments

The Debtor believes that its microwave technology may provide an effective treatment for striae or stretch marks. Stretch marks currently have limited treatment options and both providers and patients are motivated to secure a reliable effective treatment. The market opportunity is of significant interest to the Debtor because its technology may offer a highly unique clinical solution to this condition.

In December 1999, the Debtor received IRB approval for a pilot study to treat striae or stretch marks due to scarring. Currently, although significant demand exists, there is no widely accepted treatment for this condition. Theoretically, the Debtor's technology may at a minimum provide a cosmetic improvement in the appearance of striae. However, there can be no assurance that such results will materialize upon testing.

### 8.    Additional Clinical Uses

While the Debtor continues to pursue its target market of non-invasive aesthetic clinical procedures, the versatility of the technology makes other therapeutic opportunities appear viable. The Debtor continues to evaluate the economic and development implications of the possible therapeutic uses of microwave energy, including oncology, urology, gynecology and cardiology.

### 9.    Competition and Marketing

The worldwide annual market for dermatology/cosmetic equipment sales presents a tremendous opportunity for business development. This is the result of the medical community's need for elective (private pay) income to offset declining managed care fee cutbacks. These fee cutbacks have propelled the development of the burgeoning aesthetic surgery market.

The Debtor primarily marketed its microwave technology in the cosmetic dermatology market. In recent years, there has been a substantial upsurge in the demand for non-surgical cosmetic procedures in the treatment of spider veins and removal of hair.

The Debtor primarily plans to compete in the hair removal and spider vein market segments in North America and the European Community. The Debtor's competitive advantage is expected to be hair and skin color range, effectiveness, price and safety. The end user price is expected to be in the range of $65,000 to $100,000. The Debtor's ability to effectively treat all skin types and hair colors is a significant difference between it and its competitors. Many of the competitive products currently on the market, target a certain chromophore, melanin, in the hair follicle to remove hair. However, certain skin types contain higher concentrations of melanin in the skin, which can reduce the effectiveness of the treatment. In addition, white and gray hair lack melanin. The lack of melanin in these hair colors may also reduce the effectiveness of the current products on the market. Based upon the Debtor's clinical studies to date, the Debtor does not expect these limitations with its MW 2000 system.

The Debtor's principal competitors are Candela Corporation and ESC Medical Systems Ltd among others. These companies sell, among other things, laser systems used for hair removal and the treatment of spider veins.

10. **Marketing Strategy**

The Debtor hopes to attain prominence as a market leader through a carefully constructed marketing program. Due to past cash constraints, it only marketed its products in limited market segments and geographic locations. The Debtor hopes to continue to market its products this way after confirmation and until additional funding is obtained or a strategic alliance is consummated. Once appropriate financing is available, the Debtor will launch a comprehensive marketing campaign to the extent funds permit.

To date, the Debtor has concentrated its marketing and sales efforts in the United States. All of

its future marketing efforts will be restricted by its available financial resources. If additional financing is not obtained, the Debtor will not be able to continue marketing its products and the business will likely fail after confirmation.

## 11.   Employees

The Debtor had four employees in the months preceding bankruptcy consisting of its President/Chief Executive Officer, Chief Operating Officer, Chief Financial Officer and a microwave technician. Independent companies and consultants under their supervision performed the manufacture and assembly of the Debtor's products. None of the Debtor's employees are subject to collective bargaining agreements, nor have they been on strike, or threatened to strike, within the past three years. The Debtor has no supplemental benefit or incentive arrangements with employees other than health insurance coverage and an incentive stock option plan that will not survive the Chapter 11 proceeding. No employee is being paid during the pendency of this Chapter 11 proceeding.

## 12.   Patents and Trademarks

The Debtor has obtained a patent entitled "Method and Apparatus for Treating Subcutaneous Histological Features," which focuses on the application of microwave energy to the treatment of spider veins and for use in hair removal. The Debtor also has another more recently issued patent. The Debtor has no other patent, trademark or intangible property but it does have several other patents pending.

## 13.   Research and Development Expenditures

The Debtor's success substantially depends upon the acceptance of its microwave technology for use in cosmetic dermatology and its ability to raise money. During the 2000 and 1999 fiscal years, the following amounts were spent by MW on research and development activities:

| Year Ended December 31, 2000 | Year Ended December 31, 1999 |
| --- | --- |
| $1,678,580 | $678,162 |

20

In 2001 the Debtor was unable to meet its obligations without further borrowings.

## 14.   Corporate Organization and History

The Debtor is a Nevada corporation that was incorporated as a subsidiary of Dynamic Associates, Inc. ("Dynamic") on December 4, 1997.  On February 26, 1998, the Debtor entered into an agreement with Dynamic in which the Debtor issued 14,223,929 of its common shares to Dynamic in consideration for:

(a)   all of the issued and outstanding shares of P&H Laboratories, Inc., a California corporation;

(b)   all of the issued and outstanding shares of MMC and shareholders loans to MMC in the amount of $2,169,806; and

(c)   the agreement of Dynamic to pay the Debtor a total of  $200,000.  The obligation of Dynamic to pay the sum of $200,000 is evidenced by a promissory note dated February 26, 1998. Dynamic made a payment of $50,000 toward this obligation in March of 1999, which reduced the principal amount of the debt to $150,000.

Dynamic then transferred all shares of MW Medical, Inc. to the shareholders of Dynamic through a distribution completed on March 11, 1998.  Each shareholder of Dynamic received one common share of MW Medical, Inc. for each common share of Dynamic held by the shareholder.  The shares of MW Medical, Inc. distributed by Dynamic constituted all of MW Medical's issued and outstanding shares at the time.

The Debtor sold the business of P&H under an asset purchase and sale agreement dated March 9, 1998 between P&H and Microwave Communication Corporation ("Microwave" or "MCC"), a California corporation.  Under this Agreement, the Debtor through P&H agreed to sell to Microwave all of the assets of the business of P&H.  The sale of assets by P&H to Microwave was completed on May 6, 1998. The Debtor received the following consideration on closing:

21

(a)     cash consideration of $160,943;

(b)     a promissory note issued by MCC/Ferro Systems, Inc., a subsidiary of Microwave, whereby MCC/Ferro agreed to pay to P&H the sum of $250,000 on August 1, 1998 and the sum of $243,125 on March 31, 1999. P&H has assigned this note to the Debtor; there is currently a lawsuit pending seeking to collect this debt;

(c)     the agreement of MCC/Ferro Systems, Inc. to provide the Debtor 1200 hours of microwave related services for the period through April 1, 1999, subject to a maximum of 100 hours per month;

(d)     office space for the Debtor's business at MCC/Ferro's facility in Simi Valley, California until February 28, 1999.

The obligations of MCC/Ferro under its promissory note were secured by a general security agreement against the assets of MCC/Ferro and the guarantee of Microwave. The general security agreement is subordinated to a bank financing arranged by MCC/Ferro to pay-out P&H's bank financing and pay the amounts owed.

**B.     MANAGEMENT.**

Jan Wallace is a director and President. She is also the secured creditor. Ms. Wallace was previously vice president of Active Systems, Inc. a Canadian company specializing in SGML Software, an ISO standard, in Ottawa, Ontario for the period from 1993 to 1994. Before that, she was president and owner of Mailhouse Plus, Ltd., an office equipment distribution company that was sold to Ascom Corporation. She has also been in management with Pitney Bowes-Canada and Bell Canada where she received its highest award in sales and marketing. Ms. Wallace was educated at Queens University in Kingston, Ontario and Carleton University, Ottawa, Ontario in Political Science with a minor in Economics.

Dean A. Drummond was Chief Financial Officer. He will be so employed after bankruptcy if financing can be arranged and if he has not accepted other employment that he cannot appropriately

terminate. Mr. Drummond has over 8 years of public and private accounting experience. Mr. Drummond was previously a senior accountant with Grant Thornton. While at Grant Thornton, Mr. Drummond worked with a wide variety of industries specializing in technology and manufacturing companies. From 1992-1995, Mr. Drummond was the accounting manager for BW Seafoods, Inc., an importing and wholesale company. Mr. Drummond received his bachelor's degree in accounting from the University of Southern California.

## C.    ASSETS OWNED.

The only assets of the Debtor are subject to a security interest. The assets consist of the patented and the proprietary technology, ongoing product approvals, inventory and good will. The patents and technology have no market value as it is, by definition, unique and sales of the patented product have not proved profitable despite investment of significant monies in marketing efforts. The Debtor's inventory has little value beyond scrap or salvage value except through the sale as retail product to physicians. Such sales of such expensive advanced technological equipment cannot occur without a marketing organization and the debtor has so far been unsuccessful in marketing the product successfully even with a sales organization. Retail sales of the inventory upon a Chapter 7 or other liquidation would almost surely be nil. The inventory has custom made components that have no value for other product uses. The power units and the exterior cart can probably be resold as salvage for use in other products to the manufacturer of these units at fifty per cent or less of original cost which would probably yield no more than $300,000 for all the inventory. The other components are just scrap and would contribute nothing to the value realized. The secured debt exceeds the market value of the Debtor's assets and there is no equity.

## D.    EVENTS LEADING TO FILING OF CHAPTER 11 PETITION

In the past year sales have been slower than anticipated. With the economic downturn and the events of September 11, 2001 the Debtor has been unable to raise additional capital. The note from MCC/Ferro Systems, Inc. has not been paid and litigation expenses have been incurred in connection

with that litigation. The secured lender determined that the value of the collateral and the Debtor's growing unsecured debt made it unlikely that the company could raise additional capital. Without any further loans available and with no prospect of raising additional capital in the face of its current balance sheet the Debtor is unable to continue without the aid of the Chapter 11 protection.

## E. POST-PETITION AND OPERATIONS.

### 1. Post-petition Management of the Debtor.

Management of the Debtor will remain the same. The MW Debtor will keep goodwill alive and seek to maintain good relations with its former commissioned sales people and with the potential market. The MCC Debtor will have the same management as the Debtor.

### 2. Plans of Reorganization.

The Proponents filed a Plan and Disclosure Statement on February 4, 2002. No other Plans have been filed by any party.

## ARTICLE VIII.

## SUMMARY OF THE PLAN.

The Plan is intended to allow the Debtor to clear all unsecured debt and contingent claims from its balance sheet so as to allow it to raise capital enabling it to renew its sales efforts. The Plan provides for priority wage claimants to lose their statutory priority and becoming general unsecured creditors for their entire claim and for unsecured creditors of both Debtors to receive either (i) a cash payment greater than what they would receive upon liquidation or (ii) stock in the reorganized Debtor. The Plan provides for each such creditor to make an election on the ballot. The secured creditor retains her security interest, extends the payment date and will contribute cash or make other arrangements for the administrative expenses necessary to implement the Plan. In return the secured creditor will receive most of the stock in the MCC Debtor. Shareholders retain their stock and receive five percent (5%) of the shares of the MCC Debtor. There is no assurance of success in raising the necessary capital after confirmation.

**CREDITORS AND EQUITY INTEREST HOLDERS ARE URGED TO READ THE PLAN IN FULL. CREDITORS AND EQUITY INTEREST HOLDERS ARE FURTHER URGED TO CONSULT WITH THEIR COUNSEL TO OBTAIN A COMPLETE UNDERSTANDING OF THE PLAN.**

**A.  OBJECTIVE OF THE REORGANIZATION.**

There are no assets to be distributed to creditors or shareholders beyond the cash to be advanced pursuant to the Plan as the secured creditor has a lien on all assets and is believed to be undersecured. The primary objective of this reorganization is to allow the Debtor to go forward as a public company free of all debt and with a reduced secured debt while paying its unsecured creditors more than they would receive in a liquidation. The Company can then seek business opportunities for a reverse merger that will allow creditors and shareholders to realize value not otherwise available to them. In the event of an inability to raise capital and the loss of its assets by a foreclosure sale, the reorganized company will still have the capacity to seek a reverse merger partner. There is no assurance that capital can be raised or a reverse merger accomplished.

**B.  COMPENSATION OF DIRECTORS AND OFFICERS.**

No compensation shall be paid or accrue to officers or directors of either the Debtor or the new affiliate, until after September 30, 2002. This will provide the Debtor a better opportunity to raise new capital and/or develop new sales.

**C.  POST-CONFIRMATION BUSINESS OPERATIONS.**

The reorganized Debtor will continue its business but will not aggressively attempt to make new sales during the pendency of the Chapter 11 proceeding; it will wait until after confirmation is either obtained or seems assured and funds become available. The Debtor will attempt to locate new capital and will prepare itself for reinvigorating its sales organization as soon as funds become available. There is no assurance new capital can be raised.

25

**D.    ACCEPTANCE AND REJECTION OF EXECUTORY CONTRACTS.**

The Debtor has no executory contracts except for a lease in default and rejected in the Plan. However, to the extent it is discovered that other such contracts exist, and pursuant to 11 U.S.C. § 365, the Debtor has rejected or hereby rejects all executory contracts and leases.

Any person or entity injured by such rejection shall be deemed to hold an unsecured claim against the Debtor to the extent allowed, and, **within ten (10) days before the initial hearing on confirmation of the Plan, must file a proof of claim for any damages resulting therefrom or be forever barred from asserting any claim.**

**E.    CLASSIFICATION OF AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

1.    **General.**    For the purposes of reorganization only with respect to administrative expenses and for purposes of reorganization, voting and all Confirmation matters with respect to all Claims of Creditors of the Debtor, this Plan classifies Claims in separate and distinct Classes as follows:

2.    **Class 1: Administrative Expenses.**    Class 1 shall consist of the costs and expenses of administration as defined in § 503 of the Bankruptcy Code for which application or allowance is made, or a Claim is filed, as the same are allowed, approved, and ordered paid by the Court. Administrative Expenses shall consist of: (1) all Claims arising under § 330 of the Bankruptcy Code, including reasonable compensation for actual and necessary services rendered by a professional person (including attorneys) and by any paraprofessional persons employed by such, based on, among other things, the nature, extent and value of such services, the time spent on such services, and the cost of comparable services other than in a case under Title 11; (2) the costs and expenses of the administration of this proceeding, including, but not limited to, any Bankruptcy Court Clerk fees, U. S. Trustee's fees, or Court Reporter's fees which have not been paid, the cost of reproduction and mailing of this Plan and the Disclosure Statement; (3) any post-petition operating expenses of the Debtor which are due and unpaid at Confirmation; and (4) the actual and necessary costs of preserving the Estate.

3. **Class 2: Priority Tax Claims**. Class 2 consists of all tax obligations of the Debtor, if any, which are entitled to priority under § 507(a)(8) of the Bankruptcy Code.

4. **Class 3: Priority Wage Claims**. Class 3 consists of priority wage claims.

5. **Class 4: General Unsecured Claims.** Class 4 consists of the Allowed General Unsecured Claims. This class shall include all Claims not otherwise classified.

6. **Class 5: Unsecured Portion of Secured Creditors' Claims.** Class 5 consists of the unsecured portion of Jan Wallace's secured claim. This shall be fixed at $50,000 as will be accepted by Jan Wallace as part of the Plan voting process.

7. **Class 6: Secured Claims.** Class 6 consists of the secured claim of Jan Wallace. Ms Wallace advanced monies to the company from time to time in exchange for notes and security agreements as approved by the board of directors at meetings in which she abstained from participating in connection with approval of the loans. On December 10, 2000 the board of directors approved the practice of borrowing from Ms Wallace, from time to time, as the company needed funds, in exchange for granting Ms Wallace a security interest in all the assets of the debtor. A UCC-1 was filed in the office of the Secretary of State of the State of Arizona on December 13, 2000 following the director's meeting. The prior notes and security agreements for earlier similarly secured loans by Ms. Wallace made from time to time were consolidated; and, there is now owing the sum of $1,189,939.70 which includes all monies owing to Ms. Wallace for funds advanced, for interest and for funds advanced by foregoing salary. The funds advanced in cash amounted to $770,000.00 and the amount advanced by forbearing salary is $319,948.40. The remainder of the secured claim is interest on the actual cash advanced. The Debtor believes that the security interest of Ms. Wallace is valid and could not be set aside even if there were funds available for litigation. The Debtor is controlled by Ms. Wallace and the only independent review has been by counsel for the debtor who works with Ms. Wallace in preparing the Debtor's Plan and who were selected by Ms. Wallace to represent the Debtor. Counsel believes the only argument to invalidate a part of Ms. Wallace's security interest might be that the

monies advanced by forbearing salary do not come within the precise terms of the corporate minutes approving the security but that this argument would cost money to investigate, research and litigate and would probably not prevail in that Ms. Wallace could have advanced monies to pay her salary and become secured without any argument. In any event, there appears to be no argument at all for the actual cash advanced not being fully secured and that such lower amount plus accruing interest still appears to exceed the value of the assets. Further, Ms Wallace is the person funding the plan and litigating with her would make the plan unfeasible as there are no funds to pay that expense; and, chapter 7 liquidation would likely ensue with creditors getting nothing.

Jan Wallace has expressed an intention to vote for the Plan. The Plan provides that her secured claim be reduced to $1,139,939.70, plus interest from February 15, 2002. That amount shall be evidenced by a new note secured by the same existing security interest. The note shall be payable on or before September 30, 2002.

8.      **Class 7: Equity Security Holders' Interests**. Class 7 consists of all equity interests represented by membership interests in the Debtor.

9.      **Elimination of Classes**. Any Class that is not occupied as of the date of the hearing on confirmation of this Plan by an Allowed Claim or a Claim temporarily allowed pursuant to Rule 3019 of the Bankruptcy Rules shall be deemed deleted from this Plan for purposes of voting on acceptance or rejection of this Plan and for the purpose of determining whether this Plan has been accepted by such Class pursuant to Section 1129 of the Bankruptcy Code.

## F.      IDENTIFICATION OF UNIMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS

1.      **Impaired Classes of Claims**. Classes 3, 4, 5 and 6 are impaired under this Plan. Administrative Expenses (Class 1) and Priority Tax Claims (Class 2) are treated in accordance with Section 1129(a)(9) of the Bankruptcy Code.

2.      **Impairment Controversies**. If a controversy arises as to whether any Claim or any class of

28

Claims is impaired under this Plan, such class shall be treated as specified in this Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Class or Claim under this Plan.

**G.    ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS**

1.    **Classes Entitled to Vote**.  Each impaired Class of Claims shall be entitled to vote separately to accept or reject this Plan.  Any unimpaired Class of Claims shall not be entitled to vote to accept or reject this Plan.

2.    **Creditors Not Entitled to Vote**.  Only Creditors holding Claims that are not contested may vote for the Plan unless authorized by the Court to do so after motion and court order entered prior to the Confirmation hearing unless the Debtor stipulates to allow a Creditor temporary voting privileges.

3.    **Class Acceptance Requirement**.  A Class of Claims shall have accepted this Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims of such class that have voted on this Plan.

4.    **One Vote Per Holder**.  If a holder of a Claim holds more than one Claim in any one class, all Claims of such holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims voting on this Plan.

5.    **Cramdown**.  Notwithstanding the rejection or deemed rejection of this Plan by any class of Claims, Debtor shall request that the Bankruptcy Court confirm this Plan in accordance with Section 1129(b) of the Bankruptcy Code.

**ARTICLE IX**

**TREATMENT OF ADMINISTRATIVE EXPENSES
AND CLASSES NOT IMPAIRED UNDER THE PLAN**

1.    **Class 1:  Administrative Expenses**.  The allowed amount of Administrative Expenses shall be paid:

(A)    On the later of:  (1) the Effective Date; or (2) ten days after an Order approving

29

the Administrative Expenses is entered if the Claim is one of a professional person employed under Sections 327 or 1103 of the Bankruptcy Code or otherwise employed by the Bankruptcy; or (3) for all other Administrative Expenses, twenty days after the Claim becomes an Allowed Claim; or

(B)     Through such other treatment as may be agreed in writing by such holder of an Administrative Expense; provided, however, an Allowed Administrative Expense representing a liability incurred in the ordinary course of business shall be paid by Debtor upon presentment or otherwise in accordance with the terms of the particular transaction and any agreements relating thereto; provided, however, any such consent to other treatment shall be made only if a modification is shown not to materially and adversely affect any class.

2.     **Class 2:  Priority Tax Claims**.  The Debtor believes there are no tax claims.  Debtor will pay all Class 2 claims, if any, in full on or before the Effective Date in the event Debtor is not correct.

## ARTICLE X

## TREATMENT OF CLASSES
## IMPAIRED UNDER THE PLAN

1.     **Class 3:  Priority Wage Claims.**  The entire amount of wage claims of Dean Drummond, Grace Sim and Tyler Brown shall be considered part of Class 4 even to the extent otherwise accorded a priority by the Bankruptcy Code.

2.     **Class 4:  General Unsecured Claims**.  Class 4 unsecured claimants shall have the choice of being paid under one of the two following alternatives:

A.     Payment, pro rata, from a fund of $10,000.00 to be advanced as an administrative loan by the secured creditor; or

B.     By issuance of shares pro rata according to each allowed claim so electing from a pool of 4,500,000 shares of the MW Debtor.

Said election shall be made in writing in the ballot to be mailed to creditors.  Any creditor not voting shall be deemed to have elected option (A).

3.	**Class 5:  Unsecured Portion of Secured Creditor's Claim.**  The Class 5 claims shall be paid by issuance of ninety-five percent (95%) of the shares of the Microwave Debtor that shall be issued hereunder.  The holder of the Class 5 claim shall also satisfy the $10,000 administrative loan being made for the $10,000 to be distributed to Class 4 claimants.

4.	**Class 6: Secured Claims.**	The Class 6 secured claim of Jan Wallace in the amount of $1,189,937.70 shall be allowed as a secured claim in the amount of $1,139,937.70.  The remainder of said claim, $50,000 shall be deemed a Class 5 claim.  The $1,139,937.70 secured claim shall be evidenced by a new promissory note from the Debtor payable on or before September 30, 2002.  Said note shall bear interest from January 15, 2002 until paid.  Said promissory note shall be secured by the same security interest in all the Debtor's property now held by Jan Wallace and the earlier UCC perfections shall remain effective.

5.	**Class 7:  Equity Security Holders' Interests.**  Class 7, Equity security holders (except Jan Wallace) shall retain their stock interests in the MW Debtor.  Equity security holders shall also be issued stock under § 1146 in proportion to their ownership of the Debtor from a pool of shares equal to five percent (5%) of the total shares in the Microwave Debtor.  All currently outstanding shares of the MW Debtor in the Microwave Debtor shall be cancelled and/or deemed returned to MMC Debtor as treasury shares.

**ARTICLE XI**

**GENERAL PROVISIONS CONCERNING THE
CONSEQUENCES OF CONFIRMATION.**

1.	**Ownership of the Debtor's Assets.**

The Debtor has no physical assets beyond the inventory and a small amount of office equipment; its assets are primarily know how, technology, good will and a litigation claim.  To the extent it has unknown or undiscovered assets, as of the Effective Date of the Plan, the MW Reorganized Debtor shall retain and be vested with ownership of all property of the Debtor's Chapter 11 Estate, as defined in 11 U.S.C. § 541.  Said property shall be transferred to the MW Reorganized Debtor.  Upon such transfer the MW Reorganized Debtor shall own all such property free and clear of all liens, claims and

31

interests of any person or entity, except as specifically provided for the secured creditor in the Plan or the order confirming the Plan.

**2.      Retained Right to Enforce Causes of Action.**

Nothing contained in this Disclosure Statement or in the Plan shall prevent the Debtor from enforcing any causes of action it may possess prior to confirmation of the Plan or the Reorganized Debtor from enforcing any cause of action, including any avoidance actions by operation of 11 U.S.C. §§ 542 through 551, it acquires as the result of confirmation.

**3.      Insurance.**

The Debtor has temporarily curtailed sales activity and expects to make no actual sales until after confirmation. Accordingly, it no longer has insurance as its office has been moved to the home of Jan Wallace until new premises are obtained and sales efforts can be increased.

**4.      Satisfaction of Claims.**

All classes of allowed claims and allowed interests shall receive the distributions set forth in this Disclosure Statement on account of and in complete satisfaction of those allowed claims and interests. Without limiting the foregoing, upon the Effective Date of the Plan, each holder (and each successor of a holder) of an allowed claim or an allowed interest shall be deemed to have waived, relinquished and released any and all of its rights and claims against the Debtor and the Reorganized Debtor, except as provided in the Plan or the order confirming the Plan.

**5.      Unclaimed Distributions.**

All distributions of money or securities under the Plan which are returned by the Post Office undelivered or which cannot be delivered due to the distributee's failure to provide the Reorganized Debtor with a current address will be retained by the Reorganized Debtor in trust in a federally insured bank (in the event of a distribution of a cash payment) or in an escrow account (in the event of a distribution of securities) for the distributee. After the expiration of six (6) months from the date of the first attempted distribution, any unclaimed monies, securities and all future distributions will vest in the

Reorganized Debtor, free of any claim of the distributee.

**6.** **Binding Nature of the Plan.**

Upon the entry of the order confirming the Plan, the Plan shall bind the Debtor, all entities that are to acquire any property under the Plan, all creditors, and all equity security holders, whether or not their claims and interests are impaired under the Plan and whether or not they have accepted the Plan, as determined by § 1141(a) of the Bankruptcy Code.

This means, in part, that, except as provided by an express order of the Bankruptcy Court or pursuant to the terms of the Plan or the Confirmation Order, all judicial, administrative or other actions or proceedings pending against the Debtor or arising out of claims accrued prior to the confirmation of the Plan shall be permanently enjoined unless dismissed with prejudice. The litigation pending against the Debtor at the time of the filing of the Debtor's Chapter 11 petition is identified in Exhibit "A".

**7.** **Termination of the Automatic Stay and Discharge.**

The automatic stay of § 362(a) of the Bankruptcy Code shall terminate as to actions not pending when the order confirming the Plan becomes non-appealable. However, pursuant to § 1141(a) of the Bankruptcy Code, the entry of the order confirming the Plan shall permanently bar the filing and asserting of any claims against the Debtor and the Reorganized Debtor which arose or relate to the period of time prior to the date of entry of that order, except as provided in the Plan or the order confirming the Plan.

**ARTICLE XII.**

**A.** **RISK FACTORS ASSOCIATED WITH CONFIRMATION OF THE PLAN.**

There is no assurance that the future business activities of the Debtor will be successful. The shares of stock to be issued hereunder may never have any significant value.

**B.** **TAX CONSEQUENCES**

The Proponents have not obtained a tax opinion at this time and therefore such party expresses no opinion as to the tax consequences of confirmation or implementation of the Plan to the holder of

33

any claim or interest.

BECAUSE NO PROPONENT OF THE PLAN EXPRESSES ANY OPINION AS TO THE TAX CONSEQUENCES OF THE PLAN, IN NO EVENT WILL THE DEBTOR, ANY CO-PROPONENTS OR THEIR PRINCIPALS OR THEIR PROFESSIONAL ADVISORS, BE LIABLE IF, FOR ANY REASON, THE TAX CONSEQUENCES OF THE PLAN ARE NOT AS ANTICIPATED BY CREDITORS AND EQUITY INTEREST HOLDERS. THE DEBTOR'S CREDITORS AND EQUITY INTEREST HOLDERS MUST LOOK SOLELY TO AND RELY SOLELY UPON THEIR OWN ADVISORS AS TO THE TAX CONSEQUENCES OF THE PLAN.

## ARTICLE XIII.

## IMPLEMENTATION OF THE PLAN.

The Debtor shall issue the stock certificates as provided in the Plan following confirmation. The Debtor shall employ the existing transfer agent or a qualified substitute for that purpose.

## ARTICLE XIV.

## ALTERNATIVES TO THE PLAN: LIQUIDATION ANALYSIS.

An analysis of what creditors and equity interest holders would receive if the Debtor's assets were liquidated in a case under Chapter 7 of the Bankruptcy Code is simple. There are almost no assets that are not subject to a security interest and the assets have a market value less than the security. There is a lawsuit that is against a defendant who is not thought to have assets from which a judgment can be collected. The Debtor believes the office equipment and inventory would bring no more than $302,000.00 on liquidation and that the intangible assets are not readily saleable at all. The Debtor believes there would be nothing for creditors upon a liquidation given the nature of the inventory and the intangible assets. Neither unsecured creditors nor equity interest holders would receive any distribution of any kind whatsoever in a Chapter 7 liquidation of the Debtor's assets. See the discussion of the Secured Claim in Article VIII, E, 7 for more detail as to that claim and the security interest.

In a Chapter 7 liquidation even if there were assets of the Debtor beyond the secured debt,

34

proceeds would be applied first to satisfy the administrative burden of the Chapter 7 case and then the administrative burden of the Chapter 11 case. The Debtor believes that there would be no payout to unsecured creditors and nothing would be left for equity interest holders unless such proceeds exceeded the administrative claims. In this case the Debtor believes there would be nothing for creditors. The secured creditor is contributing $10,000 to fund the cash payment.

The Debtor has identified no viable alternatives to the Plan other than proceeding under Chapter 7 of the Bankruptcy Code or dismissal of its Chapter 11 case.

## ARTICLE XV

## MODIFICATION OF THE PLAN.

Prior to the entry of the order confirming the Plan, the Debtor may propose amendments or modifications to the Plan in accordance with § 1127(a) of the Bankruptcy Code. After confirmation, the Reorganized Debtor may amend the Plan in the manner provided by Section 1127(b) of the Bankruptcy Code.

The Bankruptcy Court may, at any time, so long as it does not materially or adversely affect the interests of creditors and equity interest holders, remedy defects and omissions or reconcile any inconsistencies in the Plan or in the order confirming the Plan as may be appropriate to effectuate the Plan.

## ARTICLE XVI

## RETENTION OF BANKRUPTCY COURT JURISDICTION.

Following confirmation of the Plan, the Bankruptcy Court shall retain, without limitation, jurisdiction for the following purposes and to provide any relief the Reorganized Debtor may require to effectuate the Plan or any modification of the Plan:

1.  Deciding the proper classification of any claim, determining the proper allowance for purposes of distribution of claims estimated for purposes of voting, and resolving objections to claims;

35

2. Resolving all disputes regarding title to assets (if later discovered) of the Reorganized Debtor and all disputes arising under the Bankruptcy Code;

3. Correcting of any defect, curing any omission, or reconciling any inconsistency between the Plan and the order confirming the Plan as may be appropriate to effectuate the purposes and intent of the Plan;

4. Modifying the Plan after confirmation upon application of the Reorganized Debtor;

5. Entering any order required to enforce the rights and powers of the Reorganized Debtor;

6. Determining any claim entitled to priority under Section 507 of the Bankruptcy Code;

7. Resolve any claims or causes of action, including any avoidance actions arising under 11 U.S.C. §§ 542 through 551 , against any creditors or equity interest holders, held by the Debtor, the Reorganized Debtor or any creditors of the Debtor; and

8. Entering any order required to close the Debtor's case.

# ARTICLE XVII

## RECOMMENDATION OF PROPONENTS.

The Proponents recommend that all creditors and equity interest holders entitled to do so vote to accept the Plan because the Plan provides the best presently available alternative for a financial return. If the Plan is not approved, the Debtor would continue to seek other rehabilitative alternatives, but liquidation having the consequences discussed previously might ensue.

If all impaired classes of claims and equity interests vote to accept the Plan, the Proponents could save substantial resources, which it might otherwise have to use to obtain confirmation over the objection of an impaired class. For this and the other reasons noted, the Proponents urge you to vote to accept the Plan.

. . .

. . .

. . .

36

DATED this ___4___ day of _____, 2002.

WARNICKE & LITTLER, R.L.C.

By _____
     Ronald E. Warnicke
     Thomas E. Littler
     1411 North Third Avenue
     Phoenix, AZ 85004

**COPY** of the foregoing mailed/hand
delivered*/telefaxed** this 4th day
of February 2002, to:

The Honorable Redfield T. Baum*
United States Bankruptcy Judge
2929 N. Central Ave.
Phoenix, Arizona 85012

Office of the United States Trustee
2929 N. Central Ave.
Phoenix, Arizona 85012

By _____

37

# EXHIBIT A

<u>The Wizona Partnership v. MW Medical, Inc., et al</u>, Superior Court, Maricopa County, Arizona, No. CV2001-022155

<u>Nancy Ouprie v. MW Medical, Inc.</u>, Rockingham County Superior Court, New Hamphire, Docket No. 009-C-781

<u>Clement L. Burwell, III v. MW Medical, Inc.</u>, Superior Court, Maricopa County, Arizona, No. CV2000-007658